MERRITT et al. v. EMERY.

(Supreme Court, Appellate Division, Fourth Department. December 16, 1896.)

CONTRACTS—BREACH OF WARRANTY.

. Where a contract for the furnishing of stone for a residence provided that all defective stone would be rejected, and the contractor made reasonable efforts to comply with the contract, and the owner inspected the stone on its delivery, and rejected some and accepted the remainder. which was placed in the building, the owner could not recover as for a breach of warranty, though the stone accepted was defective.

Appeal from special term, Jefferson county.

Action by Edwin Albert Merritt and Ogden H. Tappan against Charles G. Emery to foreclose a mechanic's lien. From a judgment in favor of plaintiffs, defendant appeals. Reversed conditionally.

In the summer of 1893, the defendant was about to build a house on Calumet Island, in the St. Lawrence river, about five-eighths of a mile from Clayton. and in furtherance of his intention he employed one Griffin as an architect. who prepared very elaborate specifications; and on the 31st of July, 1893, the defendant entered into a contract with the plaintiffs, who were partners doing business under the firm name of the Potsdam Red Sandstone Company, having their place of business at Potsdam. The contract was dated July 17, 1893, although not actually executed until the 31st of July, 1893; and the contract referred to the specifications, and the same were adopted as a part of the contract. . The plaintiffs were to furnish the stone on or before the 15th day of October, 1893, by delivering them on the dock at Calumet Island for the sum of $8,700. The contract provided, viz.: "All stone to be from west quarry, Potsdam red sandstone, No. 1 stock, and of uniform color, free from imperfections of all kinds impairing its value or looks. * * * All drawings and specifications are intended to form a part of this contract." In the specifications were found the following words: "No patching or mending of defects will be allowed, and all defective stone or work will be rejected." Again, in the

specifications appear the following words: "No patching or mending of defects will be allowed and all defective stone or work will be rejected." The evidence indicates that the plaintiffs, shortly after the execution of the contract, commenced the performance of the same, and delivered substantially all the stone required by their contract before the close of the month of November, 1893; certain delays having arisen which were unavoidable, some of which are provided for in the contract. Plaintiffs allege that on September 30, 1893, the defendant paid the sum of $2,600, and on October 6, 1893, the further sum of $2,040, leaving due and unpaid thereon the sum of $4,089.15, and interest. The plaintiffs, in their complaint, also claimed that they sold and delivered stone which "were not included in written contract, and for which no written contract was executed, to the amount and of the value of $2,662.43," and they claimed "for the extra material over and above that called for by the said written contract." The answer of the defendant contains numerous denials, and sets up the contract, and claims a nonperformance thereof on the part of the plaintiffs, and alleges that the plaintiffs did not deliver to defendant as many stone as by said contract and the plans and specifications the plaintiffs were to deliver, and alleges a deficiency amounting to $138.60. The answer of the defendant also alleged, viz.: "That the plaintiffs delivered to the defendant extra stone not called for by said specifications by reason of changes thereof by the defendant, as follows, and no more: 39 feet of ashler, of the value of $15; 9½ cubic feet coping, of the value of $26.55, —in all of the value of $42.15."

Argued before HARDIN, P. J., and FOLLETT, ADAMS, GREEN, and WARD, JJ.

Hannibal Smith, for appellant.
John G. McIntyre, for respondents.

HARDIN, P. J.    Plaintiffs' evidence as to the alleged extra stone furnished is very indefinite and unsatisfactory. The proof was very general and loose as to the manner of ascertaining the number of stone delivered on the island by the plaintiffs. They produced bills of shipment executed by a common carrier, the stone having been delivered from the plaintiffs' quarry to the railroad to be transported to Clayton, and from there by means of the scow boat Glad Tidings to Calumet dock. The plaintiffs produced certain papers which were made at their office from slips made by people at the quarry. It does not appear that there was any tallying when the stone were loaded on the car, nor were the persons called who made the slips to verify them, and the evidence is not definite and certain as to the quantity of extra stone that were delivered on to the cars. Nor is this uncertainty removed by any definite proof as to the extra stone that were delivered from the car to the boat which transported the stone from Clayton to Calumet. There was no tallying of the stone, after they were put on the car, with the slips which had been gathered in a bundle at the quarry. The witness Tappan testifies that La Barge was superintendent for the plaintiffs, and, when the cars were loaded, he would send somebody to take the numbers of the stone on a regular slip—

"And that was put in the office at the quarry, and examined by the foreman, and when the car was finished, and the weights had been made up to see that the car was properly loaded, they would be rolled up in a bundle and sent to the office. * * * The stone are weighed at the quarry and the weight would indicate whether the car was loaded. These bills are entirely made from our slips in the office."

42 N.Y.S.—44

. The witness added:

"As I understand, there was no tallying, after those stone were put on the car, with slips, and examined and looked over, to see whether they tallied and corresponded, unless it was done by the defendant; and the several bills that have been put in here as being marked by me are made by me in my handwriting, and taken from these slips. I know that I copied into the bill all the necessary slips that constituted a load, because they were checked. There can be no chance of error with the set of slips before you to work from, because you can check back everything that you have to charge up. Some of these shipping bills were made some days after the receipt. That is explained by the reason that it is very common that a car would be finished, we will say, this afternoon, with loads coming down in the afternoon, which might not be unloaded before 8 or 9 o'clock."

The evidence is somewhat extensive as to the extra stone, but, after a careful perusal of the same, we are of the opinion that the plaintiffs failed to establish, by definite and competent evidence, the quantity of extra stone which were supplied by them to the defendant, and therefore, the allowance, made by the trial court, of $500 in gross for extras, does not meet with our approval. Indeed, if we look into the trial judge's opinion upon that subject, we find that he tacitly admits that the evidence was incompetent, inconclusive, and unsatisfactory upon the subject of the extras. We are not satisfied to accept his fifth finding of fact, which is to the effect that the plaintiffs were entitled to recover, for extra stone furnished, the sum of $500. However, the defendant, in his answer, admits the validity of a claim in behalf of the plaintiffs for the sum of $42.15 for extra stone. This leads to a new trial, unless the plaintiffs shall stipulate to reduce the allowance for damages, by reason of the extra stone furnished, from $500 to the sum of $42.15.

2. The trial court found that there remained unpaid to the plaintiffs from the defendant the sum of $4,060; and he also found that the defendant sustained damages in the sum of $475, which he allowed to the defendant, as stated in the twelfth finding of fact. He also found that the contract is "an executory contract. There being no express words in the contract referring to any sample, by no construction can it be regarded as one for sale by sample. The defendant has no claim for breach of warranty." During the progress of the delivery of the stone, the defendant, by his agents, inspected the stone that were offered, and in several instances rejected some of the stone, and, after such inspection and rejection, received, used, and accepted those that were actually placed in the building. The specifications, which form a part of the contract, expressly provided that "all defective stone or work will be rejected." There is no evidence in the case indicating any willful violation of the terms of the contract, or the specifications forming a part thereof. Eaton v. Waldron, 67 Hun, 551, 22 N. Y. Supp. 504. On the contrary, there is much evidence tending to show a reasonable effort on the part of the plaintiffs to comply with the requirements of the contract and specifications. And in making the findings upon the subject of the imperfections or defects, the trial judge seems to have followed the rule laid down in Miller v.

Benjamin, 142 N. Y. 617, 37 N. E. 632.    In the course of the opinion, delivered by O'Brien, J., it was said:

"There must be no willful or intentional departure, and the defects of performance must not pervade the whole, or be so essential as substantially to defeat the object which the parties intended to accomplish. Whether, in any case, such defects or omissions are substantial, or merely unimportant mistakes, that have been or may be corrected, is generally a question of fact,"—citing numerous cases.

Upon the questions arising in connection with the contract and specifications, we are disposed to leave the construction to stand upon the opinion of the trial judge in that regard.

Numerous exceptions are found in the case, to which attention has been given, but none of them, however, seem to present a prejudicial error requiring an interference with the conclusions reached by the trial judge, except those which relate to the evidence received as to the extra stone. As we have already indicated, we think the proof on the subject of the extra stone is unsatisfactory. The foregoing views lead to the conclusion that the judgment should be modified.

Judgment reversed, and a new trial ordered, with costs to abide the event, unless the plaintiffs shall stipulate to reduce the damages by the sum of $457.85 (being the difference between $500, allowed by the court, and $42.15, admitted by the answer to be due for extra stone furnished), in which case the judgment, as so modified, is affirmed, without costs of the appeal to either party. All concur.